**SO ORDERED.**

**SIGNED this 25 day of January, 2019.**

**Joseph N. Callaway**
**United States Bankruptcy Judge**

_____

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WILMINGTON DIVISION**

| | |
|---|---|
| **IN RE:** | |
| **A GOODNIGHT SLEEPSTORE, INC.,** | **Case No.: 17-03274-5-JNC** |
| **Debtor.** | **Chapter 11** |
| **JOHN C. BIRCHER, III, Chapter 7 Trustee for A GOODNIGHT SLEEPSTORE, INC.** | |
| **Plaintiff** | **Adversary Proceeding No.:** |
| **v.** | **17-00056-5-JNC** |
| **FUNDING METRICS, LLC d/b/a QUICK FIX CAPITAL,** | |
| **Defendant** | |

**MEMORANDUM OPINION ALLOWING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION TO AMEND COMPLAINT**

The matters before the court are the cross-motions for summary judgment filed by the plaintiff John C. Bircher, III, chapter 7 trustee for A Goodnight Sleepstore, Inc. ("Trustee" or "Plaintiff") and defendant Funding Metrics, LLC d/b/a Quick Fix Capital ("Funding Metrics" or "Defendant"). Also considered is the Trustee's Motion for Leave to Amend Pleadings filed August 31, 2018 (Dkt. 31). A hearing on the three motions was held on December 12, 2018 in Greenville,

North Carolina. Richard Cook and Anne Randall appeared as counsel for the Trustee, and Richard Prosser and Jill Walters appeared as counsel for Funding Metrics.

## JURISDICTION

The court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 151 and 1334 and is authorized to hear this case under the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina. The primary matters raised in the adversary proceeding make it a core proceeding pursuant to 28 U.S.C. § 157(b), and the court has statutory authority to enter a final judgment as to those matters. In addition, the parties consented to this court entering final judgment on all matters raised in the adversary proceeding. *See* Pretrial Scheduling Order of March 8, 2018 (Dkt. 21). The court consequently has constitutional authority to enter final judgment in this adversary proceeding. *Wellness Int'l Network, Ltd., v Sharif*, __ U.S. __, 135 S. Ct. 1932, 1947 (2015).

## PROCEDURAL HISTORY

A Goodnight Sleep Store, Inc. ("Goodnight" or "Debtor") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 4, 2017 (the "Petition Date"). The Debtor was unable to confirm a plan of reorganization, and the case converted to chapter 7 on March 30, 2018 (Dkt. 177). The Trustee was appointed as the chapter 7 trustee on the same date (Dkt. 178).[1] On October 4, 2017, while the Debtor was proceeding in chapter 11, Funding Metrics filed Proof of Claim Number 14-1 in the amount of $63,603.04, which carries over to the chapter 7 case. The claim has not been amended or withdrawn.

---

[1] The Trustee was originally appointed on January 22, 2018, to serve as chapter 11 trustee prior to the conversion of the case. *See* Dkt. 118.

On August 08, 2017, the Debtor filed the complaint in this adversary proceeding (Dkt. 1).[2] Funding Metrics filed its answer on October 05, 2017 (Dkt. 7). The complaint was amended as a matter of right on October 19, 2017 (*see* Dkt. 8; the "Amended Complaint"). The Amended Complaint asserts multiple claims for relief, including avoidance of preferential transfers under 11 U.S.C. § 547; avoidance of fraudulent transfers under 11 U.S.C. § 548; avoidance of lien under 11 U.S.C. § 506; recharacterization of debt as equity; breach of fiduciary duty; and objection to claim. Funding Metrics filed its answer to the Amended Complaint on October 31, 2017 (Dkt. 9; the "Amended Answer"), denying liability, primarily asserting that it made no loans to Goodnight and instead only purchased certain assets from Goodnight pre-petition for valid consideration. If it made no loan, Funding Metrics contends that no "debt" existed prior to the filing of the Goodnight chapter 11 petition. It also raised various affirmative defenses including statute of limitations and ordinary course of business as to the preference claims; rights of offset; and the equitable defenses of estoppel, waiver, laches, and unclean hands.

On August 31, 2018, the Trustee filed a Motion for Leave to Amend Pleadings (Dkt 31; the "Motion to Amend"), seeking approval to file a third version of the complaint to add additional claims and two new defendants.[3]  Funding Metrics filed a response opposing the Motion to Amend on September 06, 2018 (Dkt. 32). On September 24, 2018, Funding Metrics filed its Motion for Summary Judgment (Dkt. 37; "Defendant's Summary Judgment Motion") along with an accompanying Memorandum of Law in Support of Summary Judgment (Dkt. 38; the "Defendant's Memorandum"). The Trustee filed his Motion for Summary Judgment (Dkt. 48; "Plaintiff's Summary Judgment Motion") on October 15, 2018, which document included his Memorandum of

---

[2] After his appointment, the Trustee was substituted as the plaintiff.
[3] At the hearing, counsel for the Trustee orally withdrew the claims contained in the proposed second amended complaint that would necessitate adding the two new defendants.

Law in Support. Later that day, the Trustee filed his response in opposition to the Defendant's Summary Judgment Motion (Dkt. 52).[4] Funding Metrics opposes the Plaintiff's Summary Judgment Motion in its response of November 5, 2018 (Dkt. 54).

## FACTUAL BACKGROUND[5]

Prior to filing and during its chapter 11 case, Goodnight operated four retail store locations located in or near Wilmington, North Carolina, where it sold beds, mattresses, and related products. The Debtor obtained replacement stock under a 2013 inventory financing agreement with Simmons Manufacturing Co., Inc., which has since merged with Serta, Inc. forming Serta Simmons Bedding Company, LLC ("Serta Simmons"). The Debtor granted Serta Simmons a blanket first lien on its inventory and associated operational assets, the secured debt totaling $208,144 on the Petition Date.

By mid-2016, Goodnight was unable to meet its operational costs as they came due. In particular, it had fallen significantly behind in paying quarterly payroll withholding taxes. On August 11, 2016, Goodnight entered an agreement with Funding Metrics (the "First Agreement") designed to sell or assign $140,000 of its future customer receipts, accounts, and contract rights in exchange for an immediate cash infusion of $96,190. Under the arrangement, Funding Metrics was to receive daily payments of $1,272.73 swept from Goodnight's operating bank account from future retail sale proceeds until the agreed sum was paid. Funding Metrics contends that under the First Agreement it is not a lender in any respect, but rather a purchaser of financial rights at a discounted value, similar to but not the same as a traditional factoring contract of accounts receivable. To insure

---

[4] Granting either summary judgment motion could moot the Motion to Amend.

[5] The facts listed herein are agreed by the parties in their filings in the case, or where necessary, the version of the facts reasonably construed in the light most favorable to the party defending summary judgment. Because Plaintiff and Defendant have both moved for summary judgment, some of the factual recitation may not be consistent, and nothing herein shall be deemed a finding of fact for purposes beyond this summary judgment order pursuant to Federal Rule of Civil Procedure 56(g), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056.

the daily payment was made, Funding Metrics demanded and received a pledge of collateral for the full spread of its claim. Also, Goodnight was required to sign a confession of judgment, leases (or assignment of leases) of its stores, and a power of attorney in favor of Funding Metrics, to be held and exercised in the event of default.[6] Sonny Langley, the President, sole shareholder, and director of Goodnight, personally guaranteed all obligations due to Funding Metrics under the contract and was also obligated to execute a confession of judgment.[7]

The First Agreement defined acts and events of default, including any violation by Goodnight of its terms; a filing of bankruptcy or other termination, interruption, or suspension of the business; and any act by Goodnight that materially reduced its business inventory level. In the event of default, Funding Metrics could enforce its collateral rights without making prior demand, giving prior notice, or first seeking a cure payment. In addition to the standard provisions such as acceleration of the balance and the right to repossess collateral, upon an occurrence of default Funding Metrics was granted other rights of extraordinary relief such as the right to file the confessions of judgment in any court within Pennsylvania for the unpaid balance plus a hefty default penalty ($5000 or twenty percent of the balance, whichever is greater) and the right to seize the stores of Goodnight by exercising leases or lease assignments. Effectively, Funding Metrics alone could define default and exercise its extra-judicial remedies to seize the business before Goodnight was even aware of the default declaration.

The contract also contained several provisions that, if exercised, the Trustee contends would have given Funding Metrics full and complete control over Goodnight's business operations and finances. Among other things, the First Agreement provided that, without prior notice to or approval

---

[6] It is undisputed that the default power of attorney was never exercised by Funding Metrics, and no confession of judgment was filed. Also, no executed lease or assignment has surfaced.

[7] *See* Amended Complaint Dkt. 8 at 33.

5

of Funding Metrics, Goodnight could not change its bank account locations, names or passwords; sell the business or a material portion of its assets to a third party; grant a security interest in its assets to a third party; or incur new debt.

After the First Agreement cash infusion, Goodnight continued to struggle to make financial ends meet. It sought another round of funding from Funding Metrics, and on December 19, 2016, the parties entered a second and virtually identical financial arrangement (the "Second Agreement") with cash and credit components totaling $115,000.[8] Under the Second Agreement, the daily payment to Funding Metrics increased to $1,463.64 until it was paid $161,000.00.  Funding Metrics filed a UCC financing statement to perfect its security interest granted by the Second Agreement on January 6, 2017.

At all times the First Agreement and Second Agreement (the "Agreements") were in effect, Serta Simmons continued to hold the first lien against the assets of Goodnight.[9]  In addition, the Internal Revenue Service ("IRS") maintains that it holds a second priority lien (ahead of the Defendant's) in the approximate amount of $60,000. Funding Metrics did not dispute that its security interest is junior to the Serta Simmons claim. The Serta Simmons secured claim has not been paid in full and no personal property assets of the Debtor remain. Consequently, it is undisputed that Funding Metrics is presently left with an unsecured claim at best.

From August 16, 2016 (when the bank account draws under the First Agreement began) to the Petition Date (when the draws ceased), Goodnight made payments totaling $251,713 to Funding Metrics. It had received $188,135.70 in new money from Funding Metrics under the Agreements.

---

[8] Of that amount, $24,454.30 was used to satisfy the balance remaining under the First Agreement, leaving $89,545.70 as a new infusion of operating funds.

[9] It is unclear if Funding Metrics was aware of the Serta Simmons security interest, but a cursory review of the public record would have revealed the existence of the prior lien.

The repayment transfers occurred most business days between August 16, 2016 and June 30, 2017, via debits from Goodnight's Wells Fargo bank account initiated by Funding Metrics.[10]

Goodnight continued to suffer severe financial stress including overdrawn bank accounts, negative income, and failure to pay quarterly payroll taxes. On the petition date, Goodnight listed assets valued at $268,969 and liabilities of $1,006,059. Funding Metrics filed its $63,603 claim, of which $34,624 is asserted as secured and the balance unsecured. Before conversion, on February 2, 2018, the Trustee filed a Motion to Sell Free and Clear of Liens all remaining tangible assets of Goodnight. Funding Metrics objected on February 5, 2018 (Dkt. 133), asserting a lien on essentially all personal property of the Debtor pursuant to the Agreements and the UCC Financing Statements perfecting the same.

## APPLICABLE STANDARD

A party is entitled to summary judgment if the undisputed facts established in the record "show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The court must consider whether a reasonable jury could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant . . . ." *Humboldt Express, Inc. v. The Wise Co. (In re Apex Express Corp.)*, 190 F.3d 624, 633 (4th Cir. 1999) (citations omitted). Any evidence in the record may be considered by the court if that evidence is stipulated, uncontested, or otherwise admissible at trial. *See* Fed. R. Civ. P. 56(c)(2). The evidence need not be introduced in the form required at trial so long as "the substance or content of the evidence . . . [is] admissible . . . ." 11 James Wm. Moore

---

[10] A detailed list of the daily transfers made to the Defendant is set forth in Exhibit F to the Amended Complaint.

et al., MOORE'S FEDERAL PRACTICE, ¶ 56.91[2] (3d ed. 2017). If no objection is made, the court may consider a possible objection waived and consider the evidence. *See* Fed. R. Evid. 103(a).

The party seeking summary judgment has the initial burden of proving the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the initial burden is met, the opposing party must respond and show the existence of factual disputes sufficient to advance a genuine issue to trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). The court can then decide if "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

With respect to the Motion to Amend, amendment of pleadings should be freely given unless the amendment is unduly prejudicial to the opponent, is made in bad faith, or is futile. *See Laber v. Henry*, 438 F.3d 404, 426 (4th Cir. 2006); *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986). The Motion to Amend will be addressed after discussion of the cross-motions for summary judgment.

## DISCUSSION

The Amended Complaint contains six claims for relief against Funding Metrics, including the first two, and principal, claims seeking avoidance of preferential transfers pursuant to 11 U.S.C. § 547 and avoidance of constructively fraudulent transfers made without adequate consideration pursuant to 11 U.S.C. § 548. Each claim will be examined in turn.  However, the court must first address the competing interpretations and assumptions of the parties concerning the transactions under the Agreements—whether the funds received and daily transfers back to Funding Metrics were the fruits of a pure sale (Funding Metrics' position) or were loan proceeds hidden by the fig leaf of a disguised loan (the Trustee's position).

## I.    EXISTENCE OF A CLAIM AND DEBT

The Trustee characterizes the two transactions as hidden and "criminally usurious"[11] pre-petition loans due to the high effective interest rates of each transaction.[12] Funding Metrics argues that the transactions were not "loans" and that the money due it under the Agreements—now asserted as owed to it in this bankruptcy case under a proof of claim signed under penalty of perjury—is not an "antecedent debt" under § 547 of the Bankruptcy Code. Instead, Funding Metrics calls the transactions "Merchant Cash Advances" (shortened to "MCA"). According to it, the MCA represents the sale of future accounts receivable and daily retail store sales proceeds collections up to the defined payback amount.  More specifically, in an MCA transaction "the merchant sells its accounts receivable for a discounted amount that is paid by the MCA company up-front. The MCA company, as purchaser, recovers the receivables by taking a pre-determined percentage of the merchant's receipts until the MCA company is paid in full." *Gecker v. LG Funding (In re Hill)*, 589 B.R. 614, 619 (Bankr. N.D. Ill. 2018).[13]

Notwithstanding Funding Metrics' contentions, at first glance the transactions bear many of the hallmarks of disguised loans. The repayment transfers were made on a daily basis by direct draws from Goodnight's bank account for an agreed level amount until a sum certain exceeding the original infusion was received, much like repayment of principal (the investment) and interest (the

---

[11] Plaintiff's Summary Judgment Motion, Dkt. 48 at 36.  After discussing the annualized interest rates that the Trustee calculated, the Trustee contends that "[g]iven these annual interest rates, the Merchant Agreements are criminally usurious and void under New York law." *Id*.

[12] The transactions reflect no defined interest rate. The Trustee asserts effective annual interest rates of 159.275% under the First Agreement, and 148.515% under the Second Agreement. How he arrived at those figures is not revealed. A high school math teacher would deduct test score points for "failure to show work."  Regardless, the issue of whether a state criminal usury law has been violated is not before the court as New York law does not permit a private right of action for criminal usury.

[13] In footnote 3 on page 10 of the Defendant's Memorandum, Funding Metrics cites a plethora of recent cases from New York state courts supporting its characterization that MCA transactions are not loans. As that determination is not central to the decision in this case, those cases are not addressed here.

gross profit). The contracts provide money to the recipient only if it agrees to return a greater amount of money via temporally regular and financially level amounts backed by collateral. A personal guarantee of repayment and strong collection terms in the event of default further murk the shark-infested waters and belie the cursory "mere sale" analysis championed by Funding Metrics.[14] However, the determination of whether the MCA transactions were *pre-petition* sales, loans, or hybrid financing, while important, ultimately is not necessary to determine the claims made in this adversary proceeding. The pertinent question for determining if a debt exists for purposes of chapter 5 actions is whether money was transferred to the debtor, whether the debtor agreed to pay that money back (with or without interest), and whether repayment transfers were made during the applicable "look back" period.

Whether state law treats the transaction as a loan or a sale, while helpful in a traditional transaction, is not binding because a bankruptcy court must first look to the Bankruptcy Code itself in making that determination.  Section 101(12) of the Bankruptcy Code provides that "[t]he term 'debt' means liability on a claim." In a bankruptcy case, "claim" means:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
> (B) right to an equitable remedy for breach of performance if such breach gives rise to right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

11 U.S.C.  § 101(5).

The Bankruptcy Code does not require a court to decide whether these MCA transactions constitute "sales" or "loans," just whether a "debt" exists (or existed). The Bankruptcy Code

---

[14] As shown from the extensive litigation generating numerous reported opinions, the issue is one of hot debate under New York law. *See* Zachary Mider, Zeke Faux, David Ingold, and Dimitrios Pogkas, *Sign Here to Lose Everything*, Bloomberg (January 8, 2019), http://www.bloomberg.com/confessions-of-judgment.

definitions of "debt" and "claim" are not restricted by date; a claim can be satisfied pre-petition, continue to exist post-petition. Here, under the Agreements, Funding Metrics would initiate a daily ACH transfer from Goodnight's bank account to pay *its claim* for an agreed amount over a mathematically determined number of business days. The terms of the Agreements give rise to a right to payment, through either the daily transfers, or the confessions of judgment and default fee. The right to payment under the Agreements thus gives rise to a "claim" under the Bankruptcy Code and provides the foundation for a "debt" for purposes of this adversary proceeding.

More to the point, Funding Metrics has actively asserted a claim for a debt in this bankruptcy case since its inception.[15] Throughout the case, Funding Metrics has acted as a typical junior secured creditor.  It is listed as a secured creditor in Schedule D, Section 2.1 of the Debtor's schedules filed with the petition (*see* Dkt. 1 at 26), and no objection to this status has been made. In fact, Funding Metrics has repeatedly *confirmed* creditor status in the written case record. First, and perhaps foremost, it filed a proof of claim *signed under penalty of perjury* (Claim No. 14) seeking to recover over $63,000 from the Debtor as a secured and unsecured creditor. As another example, Funding Metrics twice opposed the Trustee's proposed sales of assets of the Debtor free and clear of liens by objections dated December 18, 2017 (Dkt. 93) and February 5, 2018 (Dkt. 133), stating: "Funding Metrics is the holder of a claim secured by a lien . . . secured by all of the Debtor's assets." (Dkt. 93, ¶ 2; Dkt. 133, ¶ 4).

In light of these positions, equity demands that Funding Metrics not be allowed to sell (rather than lend) its cake and eat it too. "Under the doctrine of 'judicial estoppel' a party is bound by his judicial declarations and may not contradict them in a subsequent proceeding involving the

---

[15] Funding Metrics maintains that the "debt" did not arise until the Petition Date. The court is at a loss to understand how Funding Metrics could have a right to payment the day after the Petition Date, but not the day before, unless the transaction is a sham unsupported by consideration.  However, Goodnight acknowledges that it received the two cash infusions, so this cannot be the case.

same issues and parties." *Judicial estoppel*, BLACK'S LAW DICTIONARY (6th ed. 1990). "The

doctrine of judicial estoppel prevents a party who 'assumes a certain position in a legal proceeding,

and succeeds in maintaining that position,' from later assum[ing] a contrary position." *Scudder v.

Dolgencorp, LLC*, 900 F.3d 1000, 1006 (8th Cir. 2018) (alteration in original) (quoting *New

Hampshire v. Maine*, 532 U.S. 742, 749 (2001)).

> For the doctrine of judicial estoppel to take effect, three considerations apply:
>
> 1) a party's later position must be clearly inconsistent with its earlier position, 2)
> whether the party succeeded in persuading a court to accept that party's earlier
> position, so that judicial acceptance of an inconsistent position in a later proceeding
> would create the perception that either the first or the second court was misled, and
> 3) whether the party seeking to assert an inconsistent position would derive an
> unfair advantage or impose an unfair detriment on the opposing party if not
> estopped.

*Baouch, v. Werner Enterprises, Inc*, 908 F.3d 1107, 1113 (8th Cir. 2018) (quoting *New Hampshire

v. Maine*, 532 U.S. 742, 750-51 (2001)). Opposing stances are taken by Funding Metrics in the

chapter 11 bankruptcy case and the adversary proceeding, which are "separate" proceedings (albeit

before the same court). The position that no antecedent debt existed, asserted by Funding Metrics

now that it has been sued, when it has filed a proof of claim and objected to asset sales, is

"inconsistent with its earlier position." *Baouch v. Werner Enterprises*, 908 F.3d, at 1113.

By taking asymmetric stances and attempting to collect on a secured claim while insulating

itself from the risk of disgorging funds transferred and paid in an allegedly preferential or

fraudulent manner, Funding Metrics presents mutually exclusive positions that, if left unchecked,

present the legal equivalent of three card monte. To permit Funding Metrics, as the party asserting

conflicting positions, to act in this inconsistent manner would allow it to reap "an unfair advantage

or impose an unfair detriment on the opposing party if not estopped." *Id.*; *see also New Hampshire

v. Maine*, 532 U.S. 742.

The court concludes and holds that under the doctrine of judicial estoppel, Funding Metrics will not be allowed to file a proof of claim and assert it is a creditor in the bankruptcy case and later maintain that no antecedent debt or claim exists in an adversary proceeding centered on the same transaction. On the other hand, the determination of the presence of an antecedent debt only opens the door for the Trustee; to avoid summary judgment, as plaintiff he must still carry the required elements of each claim over the burden of proof threshold.

## II.  CLAIMS

### A.    Preferential Transfer pursuant to 11 U.S.C. § 547

The Plaintiff alleges in the first claim of the Amended Complaint that the daily ACH drafts taken by Funding Metrics constituted preferential transfers to an insider, providing a one-year look back period pursuant to 11 U.S.C. § 547(b)(4)(B).  Section 547 states:

> . . . the trustee may avoid any transfer of an interest of the debtor in property –
>> (1) to or for the benefit of the creditor;
>> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>> (3) made while the debtor was insolvent;
>> (4) made –
>>> (A) on or within 90 days before the date of the filing of the petition; or
>>> (B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>> (5) that enables the creditor to receive more than such creditor would receive [in a hypothetical chapter 7 proceeding] . . .

Before assessing the validity of the preference action, the allegation that Funding Metrics was an insider of the debtor must be addressed. Section 101(31)(B)(iii) defines an insider as a "person in control of the debtor," and § 101(31)(F) includes a "managing agent of the debtor" in the list of statutory insiders. The Trustee maintains that "[t]he power of attorney, assignment of leases, and other provisions under the agreements whereby [the Debtor] gave control of its operations to Defendant, created a principal/agent and fiduciary relationship that makes Defendant

an 'insider' under § 101(31)." Amended Complaint, Dkt. 8 at 9. The cited provisions refer to portions of the Agreements that dictated Goodnight must provide bank account information and passwords, submit financial information to Funding Metrics, and provide a signed power of attorney and confessions of judgment. Also, Goodnight was only allowed to maintain one deposit account. Funding Metrics' daily draw, by its automatic nature, effectively came ahead of payments to other creditors including the IRS on withholding taxes.

While wide-ranging, the mere existence of these provisions (as opposed to their exercise) do not result in actual dominion over Goodnight. Mr. Langley testified at his deposition that Funding Metrics never took any action to assert control over the Debtor, that he (Mr. Langley) continued to make all business decisions, and that Funding Metrics' only connection the Debtor was to draft authorized amounts from the Debtor's bank account on a daily basis. He admitted that the only influence of Funding Metrics upon the decision-making process of Goodnight was through the knowledge that Funding Metrics must be paid the agreed amount every day.[16] Repaying a debt, however onerous, and even if founded upon a bad business decision, alone does not constitute control by the creditor or fraud. *See Landmar, LLC v Wells Fargo Bank, NA*, 978 F.Supp.2d 552, 567 (W.D.N.C. 2013).

Funding Metrics may have had the right to take over Goodnight, but it never acted as the managing agent of the Debtor. It took no action on its power of attorney, never filed the signed confessions of judgment, and never exercised the lease assignments. Had it operated Goodnight's business, deciding when to buy inventory, which creditors were paid, whether to close under-performing stores, or which employees to hire and fire, a different result might be required. Irrespective of any contractual rights that theoretically could have been invoked, the court

---

[16] *See* Langley Deposition, Dkt. 40 at 68-70, 131-132, 165-166.

concludes as a matter of law that Funding Metrics is not an insider of the Debtor for the purposes
of 11 U.S.C. § 547. The Trustee may therefore only proceed against Funding Metrics under
§ 547(b)(4)(A), which limits the review period to ninety (90) days preceding the Petition Date.
The remaining elements of § 547 are reviewed below.

> **1.      "To or for the benefit of a creditor"**

The Bankruptcy Code defines a "creditor" in § 101(10) as any "entity that has a claim
against the debtor that arose at the time of or before the order for relief concerning the debtor. . .
." Having established that Funding Metrics did have a claim against the Debtor, Funding Metrics
fits the definition of creditor. The transfers benefited Funding Metrics (the creditor) by allowing
them to continue to be paid even as the Debtor approached bankruptcy and other creditors were
not paid. The first element of § 547 is met.

> **2.      "For or on account of an antecedent debt owed by the debtor before
> such transfer was made"**

The court has previously found that the First and Second Agreements created a debt owed
to Funding Metrics by the Debtor. The debt was created at the time of contracting, which was
before the transfers were made. Therefore, the transfers complained of here were made for or on
account of an antecedent debt.

> **3.      "Made while the debtor was insolvent"**

It is undisputed that the transfers via ACH draft to Funding Metrics from the account of
the Debtor continued until approximately two days before the Petition Date. The Debtor, as shown
by the undisputed facts, was insolvent in the 90-day period leading to the filing of bankruptcy,
therefore the third prong of § 547 is satisfied.

> **4.      "Made on or within 90 days before the date of the filing of the petition"**

It is undisputed that the ACH transfers were made daily for approximately eleven (11) months prior to the Petition Date, and the transfers continued until a mere two days before the Debtor filed for bankruptcy protection.  Attached to Funding Metrics' proof of claim is a list of such transfers, showing that the ACH drafts occurred daily on nearly all business days occurring between the third and ninetieth days prior to filing during the 90-day preference period.  Therefore, the fourth requirement of § 547 is satisfied.

> **5.      "That enables such creditor to receive more than such creditor would receive . . . [in a hypothetical chapter 7 proceeding. . . .]"**

The parties acknowledged at the hearing that general unsecured creditors will receive nothing in this bankruptcy case, as administrative, secured, and priority claims far exceed available funds on hand and likely further recoveries.  As such, the money received by Funding Metrics via ACH transfer during the ninety days leading up to the Petition Date allowed it to receive more than it would have if the transfers were not made. Because the Agreements created a debt owed to Funding Metrics by Goodnight, and that as a consequence Funding Metrics holds a claim, the transfers were of an interest of the debtor, for or on account of an antecedent debt, made while the Debtor was insolvent within 90 days of the petition date, that enabled Funding Metrics to receive more than it would have in a chapter 7 bankruptcy proceeding had the payments not been made.[17] Consequently, the claim for preferential transfer under 11 U.S.C. § 547(b)(4)(A) survives summary judgment, and the Plaintiff is allowed to proceed to trial unless Funding Metrics is able to establish a statutory affirmative defense based on undisputed facts as discussed below.

> **B.      The Ordinary Course of Business Defense**

---

[17] In its Amended Answer, Funding Metrics admits that the payments from Goodnight were transfers made "for or on account of an antecedent debt owed by the Plaintiff to the Defendant before the transfers were made." Funding Metrics' Amended Answer at ¶¶ 31, 32, 39, 41. It is held to that admission.

In its answer and in its motion for summary judgment, Funding Metrics asserted that even if the First and Second Agreement support a preference action under § 547, Funding Metrics has no preference liability pursuant to the ordinary course of business defense set forth in 11 U.S.C. § 547(c)(2).

The Bankruptcy Code provides in § 547(c)(2) that:

The trustee may not avoid under this section a transfer . . . to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and such transfer was –
(A)    made in the ordinary course of business or financial affairs of the debtor and the transferee; or
(B)    made according to ordinary business terms . . .

11 U.S.C. § 547(c)(2)

Funding Metrics argues that the daily ACH drafts were part of the ordinary course of dealings between the Debtor and it, thereby blocking the Trustee from avoiding these transfers. The Trustee maintains that the ordinary course exception does not apply because these transactions were outside of the scope of the Debtor's ordinary business, which was mattress sales, and that the two parties did not have a relationship long enough to form the basis of an "ordinary course" analysis between themselves. Further, the Defendant provided no evidence of industry standards to aid the determination of the baseline ordinary course.[18]

To counter the Trustee's position, the Defendant asserts that "the ordinary course does not require a certain frequency or regularity." *See* Defendant's Memorandum, Dkt. 38 at 15 (citing *Huffman v. New Jersey Steel Corp. (In re Valley Steel Corp.*, 182 B.R. 728, 735 (Bankr. W.D. Va. 1995); *Campbell v. Cannington (In re Economy Milling Co, Inc.)*, 37 B.R. 914 (D. S.C. 1983) ("[A]n extensive showing that such transactions occurred often, or even regularly, is not necessary. The transaction need not have been common; it need only be ordinary."). It points out that while

---

[18] *See* Plaintiff's Response to Defendant's Summary Judgment Motion, Dkt. 52 at 13.

the Debtor's business was indeed selling mattresses, the business also necessarily involves the procurement of funding for the business operations.[19] Indeed, Mr. Langley's deposition testimony confirms that these transactions took place at arm's length, that Funding Metrics was the lender of last resort, that he sought financial assistance to keep Goodnight afloat, and that the two parties had had no prior dealings.[20]

The transactions here, Funding Metrics says, were made in the ordinary course of the two parties' dealings, as the only financial contact that the two entities maintained were those tied to the Agreements. While the two did not have a relationship spanning many years, it can be argued that "[t]he relevant question is not whether the transactions were ordinary with respect to some objective standard in the industry, but whether they were consistent with the course of dealings between the particular parties." *In re Valley Steel Corp.*, 182 B.R. 728, 736 (Bankr. W.D. Va. 1995). This is precisely what the 2005 change from "and" to "or" in the statute implements. The course of dealings between two parties includes "the timing of the transfers, the amount and manner of the transfer, and the circumstances under which the transfer was made." *Hovis v. Stambaugh Aviation, Inc. (In re Air South Airlines, Inc.)*, 247 B.R. 165, 173 (Bankr. D. S.C. 2000).

However, while the Agreements were made in the ordinary course of business, it is not the loan but the transfers that must be reviewed. Although the drafts were made regularly (nearly daily), in the same manner (bank draft), and for the same amount of money in most instances, that regularity did not occur every day. There are numerous unexplained downward and upward deviations; drafts returned for insufficient funds; missed payments; and other deviations from the norm. Neither party made any effort to explain the deviations and it cannot be discerned from the available record which payments were normal and which deviated from ordinary terms. A more

---

[19] *See* Defendant's Memorandum, Dkt. 38 at 16.
[20] *See* Langley Deposition, Dkt. 40 at 58-59, 69-70.

thorough review of the last three months of transfers is required to determine whether all can be saved by the ordinary course exception, or which transfers deviate and therefore are preferences.

In addition, Funding Metrics made no effort to provide adequate evidence of industry standards other than to maintain its MCA terms did not vary greatly from those in the cases litigated in New York referenced in footnote 13. "[T]he benchmark for ordinariness is the norm in the creditor's industry." *Advo-System, Inc. v. Maxway Corp.*, 37 F.3d 1044, 1045 (4th Cir. 1994). However, none of the referenced MCA agreements were produced for the court's review. By failing to offer any evidentiary showing on this point, the Defendant has not met its burden to prove an industry standard ordinary course exception under § 547(c)(2). The case will proceed to trial on the non-insider preference assertion where Funding Metrics may present evidence on its affirmative defense that the transfers were made in the ordinary course of business.

### C.    Fraudulent Transfer pursuant to 11 U.S.C. § 548

In the Amended Complaint, the Trustee alleges a claim of fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B), which makes avoidable any transfer where the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation . . . ." He argues that the daily ACH transfers from the Debtor to Funding Metrics, if not preferential transfers, constitute constructively fraudulent transfers by the Debtor as the underlying sale of receipts contained in the Agreements resulted in the Debtor receiving less than reasonably equivalent value for its money. The Trustee seeks recovery of just over $62,000, apparently the difference between the $189,545 the Debtor received and the $251,713 it paid Funding Metrics.

Such a simplistic approach overlooks the time value of money and the premium paid to account for the risk of the Debtor ceasing to create receipts. Reasonably equivalent value does not contemplate a "money in, money out" formula. The test more realistically asks whether the

purchase price appropriately approximates value—whether the values are "approximately equivalent," or "roughly equivalent." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 540 n.4 (1994).

Here, Funding Metrics "assumed the risk of non-payment; if [the Debtor] ceased producing income, [Funding Metrics] could not have been paid." *In re Hill*, 589 B.R. 614, 630 (Bankr. N.D. Ill. 2018). No evidence has been presented by the Plaintiff to show that the risk assumed by Funding Metrics, and the general nature of an MCA transaction, does not account for the difference in value between what Funding Metrics paid for the receipts and what the Debtor was required to remit back to Funding Metrics. *See BFP v. Resolution Trust*, 531 U.S. at 540 n.4. An assessment of reasonably equivalent value must take into account any intangible value that a party receives. Funding Metrics provided a funding option to the Debtor when no other lender would, providing Goodnight a tenuous lifeline to remain in business. However draconian the terms of that funding may seem in hindsight, that lifeline is a value received by the Debtor.

Finally, as discussed at length above, a debt owed to Funding Metrics by Goodnight is found to exist. The complete absence of material debt is a hallmark of a constructively fraudulent transfer, as apparent as a flare on the ocean at night. If the daily repayments from Goodnight to Funding Metrics did not repay a financial obligation supported by consideration, a finding of constructive fraud would be mandated. Here the Debtor received something of value—the cash infusions under the Agreements—and Funding Metrics got something back from the Debtor, a daily payment to satisfy a legal obligation. Whether the daily transfer was an asset of Goodnight (as the funds were, after all, in its bank account and could have been diverted) used to pay a debt or were the property of Funding Metrics held temporarily for it in constructive trust by Goodnight is not decisive, as under either scenario funds were "transferred" between the respective bank accounts. The saving grace for Funding Metrics (despite its nearly self-defeating argument to the

contrary) is that at all times money was contractually due to it from Goodnight—a "debt" under the Bankruptcy Code. The existence of a debt and claim from the actions of Funding Metrics, which support a necessary element for potential preference liability under § 547, resolve the § 548 constructive fraud claim in favor of the Defendant at summary judgment. Accordingly, summary judgment will be granted in favor of Funding Metrics with respect to the Trustee's claim made under 11 U.S.C. § 548.

### E.    Avoidance of Purported Lien pursuant to 11 U.S.C. § 506(d)

The Trustee asserts a claim for the avoidance of the purported lien of Funding Metrics.  As previously discussed, Funding Metrics filed a proof of claim (Claim No. 14-1) in the underlying bankruptcy case, $34,624.00 of which is claimed as secured. The Bankruptcy Code states in 11 U.S.C. § 506(d) that "[t]o the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void . . . ."

Funding Metrics states that it "does not oppose its claim being classified as a general unsecured claim to the extent priority secured claims exceed the value of its collateral."[21]  In this case, it was conceded at the hearing, and is evident from the record that superior liens will not be paid in full. Because Funding Metrics admits that its lien is junior, and that the senior liens will not be paid in full, ultimately it will hold, at best, an unsecured claim. The final status of its claim is best addressed through the objection to claim process (Plaintiff's sixth claim), so the issue will be held open.

### F.    Recharacterization of Debt as Equity

The Trustee offers, as a third alternative, that the funds paid via the Agreements should be recharacterized as equity investments based on the factors set forth in *Fairchild Dornier GmbH v.*

---

[21] *See* Defendant's Memorandum, Dkt. 38 at 25.

*Official Comm. Of Unsecured Creditors (In re Dornier Aviation (N. Am.), Inc.)*, 453 F.3d 225 (4th Cir. 2006). *Dornier* offers an eleven-factor test that can be applied to distinguish purported loans from equity investments. *Id.* at 233-234. These factors include: the names given to the instruments; the presence or absence of a fixed maturity date and schedule of payments; the presence or absence of a fixed rate of interest and interest payments; the source of repayment; identity of interest between the two parties; the security if any for the advances; the extent to which advances are used to acquire capital assets; and the presence of a sinking fund. *See Dornier*, 453 F.3d at 225.

An application of the elements listed above proves that the *Dornier* factors do not fit the MCA context, as the MCA is a fundamentally different transaction. Although the Agreements did create a claim and debt for Bankruptcy Code purposes, they lack a fixed maturity date, schedule of payments (other than daily drafts), and stated interest rates. There is no relationship between the parties outside of the transactions and no other factors that would lead one to believe these transactions were other than as stated. In other words, and subject to the claim and debt findings, this transaction was a "pass through payment of purchased receipts."[22]

The *Dornier* factors act to confirm the fundamental difference between an MCA and a standard promissory note or equity investment. The Agreements were bargained for at arm's length, and the court will reiterate that the parties must live with the consequences of the transactions. No evidence to the contrary was shown. The recharacterization argument fails and summary judgment will be granted in favor of Funding Metrics with respect to the recharacterization claim.

---

[22] Defendant's Memorandum, Dkt. 38 at 22.

### G.    Breach of Fiduciary Duty

The Trustee asserts a claim for breach of fiduciary duty based upon an alleged fiduciary obligation created by the power of attorney provisions present in the MCA agreements. No fiduciary duty arises from the existence of a borrower-lender relationship and, absent more, parties to a contract are not fiduciaries of one another. *Branch Banking & Trust Co. v. Thompson*, 107 N.C. App. 53, 60–61, 418 S.E.2d 694 (N.C. Ct. App. 1992). The Trustee therefore needs a different source to form the special relationship required for a fiduciary relationship to exist in a business setting. He argues that the power of attorney crafts that "something more," providing Funding Metrics with effective control of Goodnight through the daily bank account drafts to the detriment of other creditors.

While it is accurate that a power of attorney creates a fiduciary relationship, that duty only extends against the agent for actions undertaken "within the scope of his agency." *In re Will of Sechrest*, 140 N.C. App. 464, 472, 537 S.E.2d 511, 517 (N.C. Ct. App. 2000). Here the daily bank account drafts were the voluntary result of the self-executing repayment terms from the Agreements, not unilateral actions undertaken pursuant to a power of attorney or a levy on judgment execution. It is undisputed that Funding Metrics never recorded the confessions of judgment or exercised the power of attorney in any capacity.[23] Goodnight took no actions to block the daily transfers, which it may have been entitled to do if the transfers were fraudulent in nature. No showing of a fiduciary duty has been made and that claim consequently fails as a matter of law. Summary judgment will be granted in favor of Funding Metrics on the Trustee's breach of fiduciary duty claim.

---

[23] *See* Langley Deposition, Dkt. 40 at 68-69.

### H.    Objection to Claim

The Trustee's final claim in the Amended Complaint is an objection to the claim of Funding Metrics. As noted above, Funding Metrics filed Claim No. 14-1 in the underlying bankruptcy case in the amount of $63,603, of which it asserts $34,624 is secured and $28,979 is unsecured.  It is undisputed that all collateral that may have secured the claim has been sold without satisfying senior liens, so whatever claim remains is unsecured. The exhibits attached to the claim show that $34,500 of the claim is a "default fee" that, if not secured, may be a penalty subject to subordination below other unsecured claims by operation of 11 U.S.C. § 726(a)(4).

It is now established that the First and Second Agreements followed by the filed proof of claim support the existence of a debt in bankruptcy, but in its motion for summary judgment, Funding Metrics indicates that it may drop the claim.[24] To date, however, it has not withdrawn the proof of claim on the record. To the extent the parties do not stipulate otherwise, the objection to claim will be preserved for trial to challenge the validity of the amount and whether the penalty portion is subject to disallowance or subordination.

### TRUSTEE'S MOTION FOR LEAVE TO AMEND

Having addressed the cross-motions for summary judgment, the court turns now to the Motion for Leave to Amend Pleadings filed by the Trustee.  In the Motion to Amend, the Plaintiff seeks: (A) in his first two proposed new claims for relief, to divide the previously asserted preferential transfers into two categories, insider and alternatively non-insider preferences; (B) in his third cause of action, to assert a new claim under 11 U.S.C. § 548(a)(1)(A) for transfers made with actual intent to hinder, delay or defraud creditors of the debtor; (C) in the next three proposed claims for relief (four, five and six), to subdivide the constructively fraudulent transfer claim into

---

[24] *See* Defendant's Memorandum, Dkt. 38 at 25.

three separate claims as listed in subsection § 548(a)(1)(B); (D) in the proposed seventh claim for relief, to maintain a challenge under 11 U.S.C. § 506(d) to any claimed security interest; (E) in the eighth claim for relief, to repeat the recharacterization of claim to equity; (F) in the ninth proposed claim, to recover avoided transfers under 11 U.S.C. § 550(a), not only from Funding Metrics, but from two new defendants (Biz Lender, LLC and Frascella Capital, LLC); (G) in the tenth proposed claim for relief, to assert equitable subordination of the secured claim of Funding Metrics to an unsecured claim; and (H) in the eleventh proposed claim, the preserved objection to claim.

At hearing, and as confirmed in his brief, the Plaintiff voluntarily withdrew the Motion to Amend with respect to the ninth claim that would add the two new defendants.  The first, second, fourth through eighth, and eleventh proposed claims are expansions or restatements of existing claims found in the Amended Complaint, and granting leave for filing those amendments would not affect the summary judgment results noted above. Therefore, only the fraudulent transfer claims (particularly the third claim for transfers made with actual intent to hinder, delay or defraud) and tenth claim (equitable subordination) require new consideration.[25]

Federal Rule of Civil Procedure 15(a) is made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure Rule 7015 and governs amendments before trial. Rule 15(a)(1)(2) allows a party to make one amendment as of right if made before or within 21 days of the filing of a responsive pleading by the other party.  Plaintiff took advantage of this "free pass" by filing the Amended Complaint. Rule 15(a)(2) provides that subsequently "a party may [further] amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The Fourth Circuit has

---

[25] Even then, it could be argued that the proposed third claim was sufficiently contained in the Amended Complaint's second claim for relief, and that the proposed new tenth claim is just another aspect of the Amended Complaint's fourth claim for relief, but those questions are not before the court.

elaborated that "leave to amend a pleading should be freely given and denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile." *Laber v. Henry*, 438 F.3d 404, 426 (4th Cir. 2006) (quoting *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986)).

In this case, the Motion for Leave to Amend is largely rendered moot by the findings made above on the cross-motions for summary judgment. The court has determined that the Trustee may proceed with a preference action under 11 U.S.C. § 547, but only for transactions occurring within the ninety day look back period pursuant to § 547(b)(4)(B), rather than for a full year because Funding Metrics was not an insider. A further amendment to the Complaint is not required to preserve and assert the § 547 non-insider claim.

Turning to the third claim based on actual fraudulent intent, not even a scintilla of presentable evidence or support has been shown by the Plaintiff of any activity *by the Debtor* supporting a finding of its actual intent to hinder, delay, or defraud any creditor in the course of executing and undertaking the Agreements, nor with respect to any of the daily repayment transfers as required to support a claim under § 548(a)(1)(A). Making a retrospectively apparent bad deal and the resultant subsequent nonpayment of other creditors has no bearing on existence of actual fraudulent intent on the part of the Debtor. The Defendant may have intended to be paid first and drafted its contract accordingly, but this action is irrelevant as the Defendant's intent is immaterial here. The request to amend to include an actual fraud claim is futile and is denied.

Because no § 548(a)(2) constructive fraud claim survives summary judgment, proposed amendments four through six, being simply nuanced versions of that claim, are futile as well. Because Funding Metrics, by its own actions, is deemed to be a creditor with a debt existing prior

to the bankruptcy filing and the § 547 action is based upon a finding of the existence of an antecedent debt, no claim for a constructively fraudulent transfer under § 548(a)(1)(B) can survive.

Finally, the Trustee seeks to add a claim for equitable subordination pursuant to 11 U.S.C § 510(c) on the basis that the transactions are actually loans made at interest rates "criminally usurious and void under New York law,"[26] which led to other creditors of the Debtor going without payment while Funding Metrics continued to be paid. Other than the fact that the transactions occurred, no specific facts are contained in any pleading to support such a claim; therefore, the Plaintiff's burden under applicable pleading standards from *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) is not met.

As noted in the discussion on the objection to claim for summary judgment purposes, $34,500 of the filed proof of claim is subject to possible subordination under 11 U.S.C. § 726(a)(4). A further objection as to that portion of the claim is superfluous.  No tangible assets remain; the only assets to be collected in the case are the few thousand dollars at issue in the surviving § 547 action, and then only if the Plaintiff is successful. Chapter 11 administrative claims of professionals and the unpaid priority tax claims in the case far exceed funds on hand in the case and no source exists to pay those claim, much less the allowable general unsecured claims. Therefore, an amendment to pursue equitable subordination of the non-penalty portion of Funding Metrics' claim is moot.

Accordingly, the Motion for Leave to Amend is denied as futile and moot, with the proviso that a non-insider § 547 action by the Plaintiff is deemed to have survived summary judgment without the need for further amendment.  The proposed amendment does not contain new factual

---

[26] Plaintiff's Summary Judgment Motion, Dkt. 48 at 36.

pleadings (or even evidentiary forecast) necessary for the § 548(a)(1) and (2) claims to survive pre-trial dismissal and allowing the motion would result in nothing but further delay.

## CONCLUSION

Based on the foregoing, it is hereby ORDERED and DECREED:

1.  The Summary Judgment Motion of Funding Metrics is ALLOWED as to claims for:

    a.  avoidance of preferential transfers under 11 U.S.C. § 547 based on insider status (those between one year and ninety days preceding the Petition Date);

    b.  avoidance of fraudulent transfers under 11 U.S.C. § 548;

    c.  recharacterization of debt as equity; and

    d.  breach of fiduciary duty.

2.  The Summary Judgment Motion of Funding Metrics is DENIED as to avoidance of non-insider preferential transfers under § 547 and the objection to claim counts. The avoidance of lien count is preserved and will be considered with the objection to claim count to the extent necessary.

3.  The Summary Judgment Motion of the Trustee is DENIED;

4.  The Trustee's Motion for Leave to Amend is DENIED consistent with the survival of the claims for non-insider § 547 action; no further pleading is required of either party.

5.  The case will proceed to trial on the Trustee's actions seeking avoidance of non-insider § 547 transfers and objection to claim. A scheduling conference will be noticed, and an amended scheduling order will later be entered by the court.

## END OF DOCUMENT